MIDWAY AIRLINES, INC., a Delaware corporation, and David R. Hinson, an individual, Plaintiffs,

v.

Kenneth T. CARLSON, et al, Defendants.

Kenneth T. CARLSON, et al, Counterclaim Plaintiffs,

v.

MIDWAY AIRLINES, INC., a Delaware corporation, and David R. Hinson, an individual, Counterclaim Defendants.

Civ. A. No. 85–319 LON.

United States District Court, D. Delaware.

June 14, 1985.

Michael D. Goldman, James F. Burnett, David B. Brown, Donald J. Wolfe, Jr. (argued), and Richard L. Horwitz of Potter Anderson & Corroon, Wilmington, Del.; of counsel: Latham & Watkins, and Wachtell Lipton Rosen & Katz, New York City; for plaintiffs and counterclaim defendants.

Stephen J. Rothschild (argued), Thomas J. Allingham II, and Randolph K. Herndon of Skadden, Arps, Slate, Meagher & Flom; Wilmington, Del., for defendants and counterclaim plaintiffs.

LONGOBARDI, District Judge.

Plaintiffs, Midway Airlines, Inc. ("Midway") and David R. Hinson, the president, chief executive officer and chairman of the board of Midway, brought this action alleging that the Defendants violated federal and state securities laws and seeking declaratory and injunctive relief. Defendants are the Stockholders Committee to Revitalize Midway Airlines ("the Committee"), an unincorporated association formed to seek control of Midway, the individual members of the Committee and Jet Express, Inc., a Delaware corporation which Plaintiffs allege is an undisclosed member of the Committee.[1] The Committee is seeking to oust the current board of Midway and replace them with the Committee's nominees by means of a stockholder's consent procedure pursuant to 8 Del.C. § 228.[2]

---

1. Plaintiffs subsequently amended their complaint to add Bader Express, a Connecticut limited partnership in which Jet Express, Inc. is the general partner. Docket Item 34.

2. Section 228 provides as follows:
   (a) Unless otherwise provided in the certificate of incorporation, any action required by

The Committee members have counter-claimed against Midway charging violations of the federal securities laws. They have also asked the Court, pursuant to 8 Del.C. § 220, to order Midway to allow them to inspect two types of documents: (1) all books and records of Midway relating to the Midway shareholders meeting held on May 16, 1985, and (2) a list of the shareholders of Midway and a list of the bondholders of Midway who have the right to convert into Midway stock. Currently before the Court is a dispute over the Committee members' right to obtain the list of holders of convertible bonds. Although this counterclaim is based on rights allegedly conferred by a state statute, this Court has pendent jurisdiction to decide this dispute. In resolving the issues presented, the Court must apply Delaware law.

Section 220(b) allows any stockholder of a corporation "upon written demand under oath stating the purpose thereof, ... to inspect for any proper purpose the corporation's stock ledger, a list of its stockholders and its other books and records." A "proper purpose" is defined as a purpose reasonably related to his interest as stockholder. Section 220(c) allocates the burden of proving a proper purpose in those situations where the corporation refuses to allow inspection. It makes an important distinction between the corporation's stock ledger and list of stockholders on the one hand and its other books and records on the other. Once a stockholder seeking to inspect the stock ledger and stockholder list demonstrates that he has made a demand in the proper form, the burden of proof is on the corporation to show that he has an improper purpose. However, a stockholder seeking other books and records has the burden of proving that he has a proper purpose as well as the burden of proving that he has made a proper demand.

In this case, the parties disagree about whether the list of holders of convertible bonds should be classified as a "list of stockholders" or as "other books and records" for the purpose of allocating the burden of proof of proper purpose. This dispute is in turn related to a more basic dispute over the record date for determining which shareholders are entitled to vote in the consent procedure initiated by the Committee. The Committee members contend that May 20, 1985, the date on which the first consent was expressed, is the record date for the consent proceedings. If this position is correct, any bondholders who converted after May 20th would not be entitled to vote in the consent procedure and, therefore, as the Committee members concede, they would have no need for the list of bondholders. However, Midway has refused to stipulate that the record date is May 20th and, at this point, refuses to take a position on whether the Midway board has the right to set a new record date. If the Midway board were to set a new record date and if the Court were to uphold their power to do so, any bondholders who converted between May 20th and the new record date would have the right to vote in the consent procedure. Because of the possibility that these bondholders will be able to vote, the Committee members contend that they are entitled to know their identity in order to solicit support for the Committee's position. Otherwise, the Midway board, which already knows the identity of the bondholders, would have an unfair advantage in the battle for support.

Thus, it is apparent that the Committee members' need for the list of bondholders

---

this chapter to be taken at any annual or special meeting of stockholders of a corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to autho-

rize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

\*   \*   \*   \*   \*   \*

(c) *Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to* those stockholders or members who have not consented in writing.

depends on whether the Midway board has the power to change the record date. Whether the board in fact possesses this power is a question of fundamental importance which will likely have to be resolved at some point in this case and a resolution of this question may also resolve the dispute over the convertible bondholder list.

The determination of the record date is governed by 8 Del.C. § 213 which provides that:

(a) In order that the corporation may determine the stockholders entitled to ... express consent to corporate action in writing without a meeting, ... the board of directors may fix, in advance, a record date, which shall not be ... more than 60 days prior to any ... action.

\*   \*   \*   \*   \*   \*

(b) If no record date is fixed:

\*   \*   \*   \*   \*   \*

(2) The record date for determining stockholders entitled to express consent to corporate action in writing without a meeting, when no prior action by the board of directors is necessary, shall be the day on which the first written consent is expressed;

Clearly, if the Midway board does not establish a record date, under section 213(b)(2), the record date in this case would be May 20th, the date of the first consent. It is also clear under section 213(a) that, prior to May 20th, the board had the power to establish a record date. The issue which the Court must resolve is whether the board retains this power even after the first written consent is expressed. Since there appear to be no cases directly on point, the Court will look to the statutory language and the underlying policy considerations in attempting to discern the statute's meaning and how it would be interpreted by the Delaware courts.

First, examining the statutory language, section 213(b)(2) provides that "[i]f no record date is fixed [,t]he record date ... shall be the day on which the first written consent *is* expressed." (emphasis added). If the board has the power to fix the record date even after the first consent is filed, then the phrase "[i]f no record date is fixed" must mean that no record date was fixed at the time the consent procedure was concluded since this is the only situation in which section 213(b)(2) applies. However, if the statute means that at the end of the procedure it can be retroactively determined that the date of the first consent was the record date, then the last clause of section 213(b)(2) should read "shall be the day on which the first written consent *was* expressed." Since the statute uses the present tense ("*is* expressed"), it indicates that section 213(b)(2) applies whenever a record date has not been fixed by the time the first written consent is filed.

The Court must also consider the practical effect of allowing the board to set a new record date after some of the consents had already been filed. All shareholders who consented and then sold their stock before the record date would have their consents retroactively invalidated. Mass confusion and uncertainty among the shareholders would result from such retroactive invalidation. In *Pabst Brewing Co. v. Jacobs*, 549 F.Supp. 1068 (D.Del.), aff'd, 707 F.2d 1394 (3d Cir.1982), the court held that a reasonable shareholder would consider it important to know how long the consents would remain effective. If the board could change the record date and retroactively invalidate consents, not only would the shareholders not know how long their consents were effective but they would not know if the consents counted at all until the consent procedure was completed.

Finally, and perhaps most importantly, to allow the board to modify the record date after a consent has been expressed would be grossly unfair because it would give the incumbent board tactical advantages over those trying to unseat them. A board faced with an adverse consent procedure could impose a delay of up to sixty days by the simple expedient of setting a new record date. Cf. *Plaza Securities Co. v. O'Kelley*, Del.Ch., C.A. No. 7932, slip op. at

12–13 (Mar. 5, 1985), *aff'd*, Del.Supr., No. 79, 1985 (Mar. 8, 1985). This would allow time for defensive tactics and would also force the insurgents to resolicit the successors of those shareholders who had consented and then sold their shares. Conversely, if the board decided that it was to their advantage to end the consent procedure as quickly as possible, they could simply take no action. The insurgents would then be required to obtain a majority within sixty days of the date of the first consent. *Pabst Brewing Co. v. Jacobs*, 549 F.Supp. at 1072–73.

The Delaware courts have stressed the importance of fairness to both sides in a contest for corporate control. *See, e.g., Schnell v. Chris-Craft Industries, Inc.,* Del.Supr., 285 A.2d 437 (1971); *American Pacific Corp. v. Super Food Services,* Del. Ch., C.A. No. 7020, slip op. (Dec. 2, 1982); *Lerman v. Diagnostic Data, Inc.,* Del.Ch., 421 A.2d 906 (1980). Allowing the board to change the record date in the middle of a consent procedure would allow an unwarranted advantage to incumbent management.

Thus, the statutory language and the underlying policy considerations support the conclusion that the Midway board does not have the power to change the record date after the first consent has been filed. In this case, the record date is May 20, 1985, and any bondholders who convert to Midway stock after that date will not be entitled to vote in the consent procedure. Under this interpretation, the Committee members have conceded that they do not need the list of holders of convertible bonds. The Committee members' request for an order compelling Midway to allow inspection is accordingly denied.